**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 09a0824n.06

No. 08-6548

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Dec 22, 2009**

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| **STEVEN C. SIMPSON**, | ) | |
| | ) | ON APPEAL FROM THE |
| *Plaintiff-Appellant*, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE MIDDLE |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| **THE VANDERBILT UNIVERSITY**, a Tennessee | ) | **O P I N I O N** |
| Corporation doing business as Vanderbilt University | ) | |
| Medical Center, | ) | |
| | ) | |
| *Defendant-Appellee*. | ) | |

BEFORE:    RYAN, COLE, and CLAY, Circuit Judges.

**COLE, Circuit Judge.** Plaintiff-Appellant Steven Simpson appeals from the district court's grant of summary judgment to Defendant-Appellee, Vanderbilt University, on his claims of discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12112, *et seq*., ("ADA"), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, *et seq*., ("Title VII").  For the following reasons, we **AFFIRM**.

## I. BACKGROUND

### A. Factual background

Simpson, a registered nurse, began working the night shift in the 7 North Cardiac Step-Down Unit of Vanderbilt University Medical Center ("Vanderbilt") on September 10, 2001.  In November 2004, Simpson moved to the 6 South Cardiac Step-Down Unit and was elevated to the position of night-shift charge nurse, supervising the other nurses on duty, but he sometimes still worked as a

regular staff nurse. Renee McKibben, the assistant manager of the 6 South unit, was Simpson's direct supervisor until she left for another job in November 2006. On October 5, 2005, Judy Araque became the manager of both units, serving as Simpson's supervisor and McKibben's direct supervisor.

### 1. Simpson's health problems and transfer requests

In 2003 or 2004, Simpson was hospitalized for chest pains and heart palpitations. Simpson's physician, Dr. Travis Calhoun, told Simpson that his health problems could be alleviated if he worked the day shift. Simpson relayed this information to McKibben, his supervisor at the time, but never submitted any medical documentation to support his transfer request.

In late 2005, soon after Araque had become his supervisor, Simpson's medical difficulties worsened. In particular, in November 2005, Simpson began to have significant sleep problems; four or five days per week, he would sleep for only two and one-half to three hours. Simpson also was suffering from migraine headaches and panic attacks. Because of his health problems, Simpson took leave from work under the Family and Medical Leave Act from February 12, 2006, to March 6, 2006, with a diagnosis of paroxysmal cardiac arrhythmia, fatigue, hypertension, hypersensitivity to medication, and nausea/anorexia. When Simpson returned to work, he again broached the subject of transferring to a day-shift position with McKibben and Araque, but was never transferred. The parties dispute whether Simpson properly applied for a transfer. Vanderbilt claims that it had changed its transfer policy by February 2006, requiring employees interested in a transfer to submit an application through the human resources department and be interviewed. Simpson claims he was never informed of this policy change or of specific day-shift positions that were open in 2006.

### 2. Simpson's disputes with Araque

Simpson cites a number of interpersonal conflicts that occurred in the year leading up to his termination in support of his discrimination claims, including the following: In December 2005, after a dispute between Simpson and a female coworker, Araque took the female employee's side before hearing his side of the story, sending her flowers and reprimanding Simpson. In February 2006, Simpson and Araque clashed over who was responsible for covering for an employee who had gone home sick. In March 2006, while Simpson was giving an oral report outside a patient's room to an incoming nurse, Araque grabbed Simpson's arm and shoved him into the patient's room because he was supposed to give the report at the patient's bedside. Simpson was giving the report outside the patient's room because the patient had requested that her terminal cancer not be disclosed to her family. At a meeting between McKibben, Araque, and Simpson in March 2006, Araque told Simpson that he intimidated the other nurses with his deep, male voice and the way he stood with his arms crossed or with his hands on his hips. Later that spring, Simpson was not chosen to attend a nursing educational program even though he had seniority over the two female nurses chosen to attend, and the original announcement for the program indicated that seniority would be the sole factor in determining who would attend. That summer, McKibben hired a female night-shift charge nurse and allowed her to work on weekends only, even though this deprived Simpson and the other male night-shift charge nurse, Gary Houston, of the hourly bonus given for weekend work. Finally, in October 2006, Araque again sided with a female employee about whom Simpson had complained. Simpson complained to McKibben and other employees about Araque's conduct towards him several times during 2006.

### 3. December 13, 2006, incident and Simpson's termination

Vanderbilt terminated Simpson after an investigation into the events that took place during his shift on December 13, 2006. On that night, Simpson was working as a staff nurse, under the supervision of Houston, who was the charge nurse. Simpson felt ill before arriving at work; he had a migraine headache and he had been experiencing episodes of cardiac arrhythmia, shortness of breath, and faintness. Between 10:30 and 11:00 p.m., Simpson's symptoms worsened and he asked Houston if he could leave work early. Houston denied Simpson's request and told him to go to the emergency room instead. When Simpson reasserted his request to go home, Houston "became aggressive, stood up and put his finger in [Simpson's] face, stating, 'You ain't going no damn where.'" As Simpson turned away, Houston hit him from behind and knocked him into a supply cart. Simpson then contacted the house supervisor, John Chaballa, for permission to leave early. Chaballa gave Simpson permission to leave early and directed him to turn over to Houston each of the four patients he was responsible for that night.

At Vanderbilt, patient charting is carried out electronically with accompanying handwritten records. Simpson asserts that he completed the electronic charting for two of his patients, but that when he attempted to save the information a computer error caused him unintentionally to delete the data, though at the time he believed it to be saved. Simpson did not complete electronic charting for the other two patients, claiming that Houston ordered him to turn over his notes and leave before he could do so. Simpson claims that, before leaving, he went room-to-room with Houston, giving Houston a verbal report on each patient. Although Vanderbilt contends that Simpson was responsible for documenting the care that he provided to his assigned patients before taking ill,

Simpson argues that it was the dual responsibility of Simpson and Houston to make arrangements to cover for Simpson, and that the only 6 South unit policy was that nurses had to complete an admission assessment within eight hours of a patient's arrival to the floor. Before clocking out for the night, Simpson emailed Araque explaining his altercation with Houston.

The next morning, Araque learned of the incident and reported it to Vanderbilt's human resources department. The following day, Simpson met with Araque and Marta Stinson, Vanderbilt's Employee Relations Representative. In addition to reviewing what happened the night of December 13, 2006, Simpson complained to Stinson about Araque's treatment of him, including the various incidents that had taken place over the course of the previous year. In accordance with Vanderbilt's policy concerning allegations of physical altercations, both Simpson and Houston were placed on administrative leave pending an investigation.

Vanderbilt's investigation of the physical altercation was forestalled because Simpson and Houston gave conflicting accounts of what happened and there were no other witnesses. However, as part of the investigation, Araque reviewed the patient records for Simpson's patients that night. Based on this review, Vanderbilt determined that Simpson failed to properly chart any of his four patients. While Simpson concedes that the electronic records for his patients were incomplete, he contends that he properly cared for those patients and kept handwritten records, which Araque failed to review.

On December 21, 2006, Vanderbilt terminated Simpson for the stated reason of failing to properly chart the patients in his care that night. Vanderbilt contends that the decision to terminate Simpson was made jointly by Araque, Stinson, and each of their immediate supervisors. Vanderbilt

fired Houston for the same reason.

**B. Procedural background**

In January 2007, following his termination, Simpson filed an internal complaint with Vanderbilt. On February 6, 2007, he filed a discrimination claim with the EEOC, which he amended on February 13, 2007, to include a claim of disability discrimination. After receiving his "right-to-sue" letter from the EEOC, Simpson filed a complaint in federal district court against Vanderbilt and Araque on November 16, 2007. His claims included disability, reverse-sex, and age discrimination, as well as related retaliation claims.

On March 11, 2008, the district court dismissed Simpson's claims against Araque. On November 25, 2008, the district court granted Vanderbilt's motion for summary judgment on all of Simpson's remaining claims. On December 22, 2008, Simpson timely appealed the district court's summary judgment order on his disability and reverse-sex discrimination claims. We have jurisdiction over the district court's final judgment under 28 U.S.C. § 1291.

## II. ANALYSIS

**A. Standard of Review**

This Court reviews a grant of summary judgment de novo. *Sullivan v. Or. Ford, Inc.*, 559 F.3d 594, 594 (6th Cir. 2009). The moving party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Henderson v. Walled Lake Consol. Sch.*, 469 F.3d 479,

487 (6th Cir. 2006).

**B. ADA claim**

First, Simpson claims that his termination and Vanderbilt's failure to transfer him to a day-shift position constituted unlawful discrimination under the ADA. The district court correctly granted summary judgment on Simpson's ADA claim because he failed to raise a genuine issue of material fact as to whether he qualified as "disabled" under the ADA. To prevail on his disability-discrimination claim, Simpson must show that: (1) he was "disabled" under the ADA; (2) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodations; (3) he suffered an adverse employment action; (4) Vanderbilt knew or had reason to know of his disability; and (5) a non-disabled person replaced him. *Nance v. Goodyear Tire & Rubber Co.*, 527 F.3d 539, 553 (6th Cir. 2008) (citing *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996)). To qualify as "disabled" under the ADA, "an individual must (1) have a physical or mental impairment which 'substantially limits' him or her in at least one 'major life activity,' (2) have a record of such an impairment, or (3) be regarded as having such an impairment." *Mahon v. Crowell*, 295 F.3d 585, 589 (6th Cir. 2002) (citing 42 U.S.C. § 12102(2)).

Simpson claims that he put forth sufficient evidence to show that his ailments constitute a disability under the ADA because they substantially limit his ability to sleep. Further, he asserts that Vanderbilt regarded him as disabled. The district court correctly rejected both of these arguments.

*1. Simpson was not actually disabled under the ADA*

While this Court considers sleep to be a major life activity for purposes of the ADA, *Verhoff v. Time Warner Cable, Inc.*, 299 F. App'x 488, 492 (6th Cir. 2008) (citing *Boerst v. Gen. Mills*

- 7 -

*Operations*, 25 F. App'x 403, 406 (6th Cir. 2002)); *see also Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 314 (6th Cir. 2001) (assuming, without deciding, that sleep is a major life activity), Simpson's sleep problems do not rise to the level of substantial impairment under our precedent nor has he presented sufficient evidence to substantiate his claims. This Court has held that sleeping between two and four hours per night, "while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation." *Boerst*, 25 F. App'x at 407. At his deposition, Simpson testified that starting in November 2005, he was sleeping three or fewer hours five days per week, while sleeping longer the other two days. Dr. Calhoun testified about Simpson's sleep deprivation, but offered no specific testimony about how much Simpson was sleeping. Therefore, Simpson was not substantially limited in the major life activity of sleep and, in turn, was not actually disabled under the ADA.

Simpson asks us to follow the D.C. Circuit's decision in *Desmond v. Mukasey*, 530 F.3d 944, 957 (D.C. Cir. 2008), which held that whether two to four hours of sleep per night for five months rose to the level of a substantial limitation was a factual question best suited for the jury. However, the *Desmond* court specifically acknowledged that the Sixth Circuit has declined to send similar cases to a jury. *See id.* at 957 (citing *Swanson*, 268 F.3d at 316-17 (holding that sleeping only four to five hours per night was not a substantial limitation)); *see also Pack v. Kmart Corp.*, 166 F.3d 1300, 1306 (10th Cir. 1999) (holding that plaintiff's depression-related sleep difficulties, limiting her to two to three hours of sleep some nights, was not a substantial limitation). Further, even if we were to find that fewer than three hours of sleep per night amounts to a substantial limitation, Simpson's uncorroborated testimony about his sleep habits is not enough to raise a genuine issue of

material fact as to whether his sleep was substantially limited. *See Greathouse v. Westfall*, 212 F. App'x 379, 383 (6th Cir. 2006) (holding that general statements from plaintiff and his doctors about his sleep problems, without more specific evidence, were insufficient to establish a substantial limitation); *see also Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 198 (2002) ("It is insufficient for individuals attempting to prove disability status under this test to merely submit evidence of a medical diagnosis of an impairment."), *partially superseded by statute*, ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008); *Squibb v. Mem'l Med. Ctr.*, 497 F.3d 775, 784 (7th Cir. 2007) (finding that plaintiff's unsupported assertions that she sleeps no longer than three to four hours per night was not sufficient to withstand summary judgment on ADA claim).

### 2. Simpson was not "regarded as" disabled by Vanderbilt

Simpson also has failed to demonstrate that Vanderbilt regarded him as disabled. Under the ADA, an individual who is "regarded as" disabled by his or her employer qualifies as disabled for purposes of the Act. *See* 42 U.S.C. § 12102. "This part of the [ADA] is intended to allow individuals to be judged according to their actual capacities, rather than through a scrim of 'myths, fears, and stereotypes' accruing around a perceived impairment." *Mahon*, 295 F.3d at 592 (citing *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489-90 (1999)). This Court has noted that whether a plaintiff was "regarded as" disabled is "a question embedded almost entirely in the employer's subjective state of mind" such that "proving the case becomes extraordinarily difficult." *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001). An employee is "regarded as" disabled under the ADA if his employer (1) mistakenly believes that he has a physical impairment that

substantially limits one or more major life activities, or (2) mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. *Mahon*, 295 F.3d at 592 (citing *Sutton*, 527 U.S. at 489). The facts construed in the light most favorable to Simpson support a finding only that Vanderbilt knew that Simpson had certain health problems, but not that Vanderbilt regarded him as "impaired." *See Milholland v. Sumner County Bd. of Educ.*, 569 F.3d 562, 568 (6th Cir. 2009) ("That the defendants were aware of [the plaintiff's] health issues does not support a conclusion that they misperceived [her] physical abilities as impaired and affecting her performance."); *see also Ross*, 237 F.3d at 709 ("'It is not enough . . . that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA.'" (quoting *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998))).

Simpson's ADA claim fails as a matter of law because he did not present sufficient evidence to show that he was actually disabled or that Vanderbilt regarded him as disabled. Therefore, the district court was correct in granting Vanderbilt summary judgment on these claims.

**C. Title VII claims**

Simpson next alleges that his termination and Vanderbilt's failure to transfer him violated Title VII. He presents three related Title VII claims: (1) reverse-sex discrimination, (2) retaliation, and (3) creation of a hostile work environment. We consider each of these claims in turn and find that the district court correctly granted Vanderbilt summary judgment on each claim.

***1. Reverse-sex discrimination***

Simpson's first Title VII claim is that Vanderbilt discriminated against him because he is

male. To survive a motion for summary judgment, he must adduce either direct or circumstantial evidence of unlawful discrimination. *See DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Because he has offered no direct evidence of discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973); *see also Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981); *DiCarlo*, 358 F.3d at 414. Under this framework, the plaintiff must first make out a prima facie case of discrimination, after which the burden shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision. *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020-21 (6th Cir. 2000). If the employer carries its burden, the plaintiff must then prove by a preponderance of the evidence that the employer's proffered nondiscriminatory reason was pretextual. *Id.*; *DiCarlo*, 358 F.3d at 414-15. Throughout this burden-shifting process, "'[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *DiCarlo*, 358 F.3d at 415 (quoting *Burdine*, 450 U.S. at 253) (alteration in original).

(a) *Simpson has failed to establish a prima facie case of reverse-sex discrimination*

To establish a prima facie case of discrimination under Title VII, a plaintiff must show that he (1) is a member of a protected class; (2) was qualified for the job or promotion sought; (3) experienced an adverse employment action; and (4) was replaced by someone outside of the protected class or was treated differently than similarly situated employees outside the protected class. *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008); *see Leadbetter v. Gilley*, 385 F.3d 683, 690 (6th Cir. 2004) (citing *McDonnell Douglas*, 411 U.S. at 792; *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 (6th Cir. 2003)). However, in so-called reverse-discrimination

cases, where a member of the majority group claims discrimination, we have modified the first and fourth prongs of the traditional prima facie test. *See Leadbetter*, 385 F.3d at 690. Under this modified analysis, "to satisfy the first prong of the *prima facie* case, the plaintiff must 'demonstrate background circumstances [to] support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Sutherland*, 344 F.3d at 614 (second set of internal quotation marks omitted) (quoting *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir. 2002)). "To satisfy the fourth prong in such cases, the plaintiff must show that the defendant treated differently employees who were similarly situated but were not members of the protected class." *Id.* However, we have expressly cautioned against letting these modifications "impermissibly impose a heightened pleading standard on majority victims of discrimination." *Zambetti*, 314 F.3d at 257; *see also Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 n.7 (6th Cir. 1994) ("We have serious misgivings about the soundness of a test which imposes a more onerous standard for plaintiffs who are white or male than for their non-white or female counterparts.").

The district court correctly held that Simpson's prima facie case of reverse-sex discrimination failed on the fourth prong because he failed to provide adequate evidence of a similarly situated female employee being treated more favorably. In an affidavit, Simpson presented allegations about a female staff nurse, Dorothy Terrell, who supposedly failed to chart a patient assigned to her for an entire shift, but was not terminated. As a threshold matter, this evidence cannot be considered on summary judgment because it is inadmissible hearsay. *See Jacklyn v. Schering-Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 927 (6th Cir. 1999) ("Hearsay evidence may not be considered on summary judgment.") (citing *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994)); *see also*

*Quinn-Hunt v. Bennett Enters., Inc.*, 211 F. App'x 452, 458 (6th Cir. 2006) (excluding inadmissible hearsay evidence about comparable employees on summary judgment). Regardless, even considering the hearsay testimony, Simpson failed to establish that Terrell was similarly situated to him. This Court has held that to be similarly situated, the comparable employee must have engaged in acts of "comparable seriousness." *See Clayton v. Meijer, Inc.*, 281 F.3d 605, 611-12 (6th Cir. 2002). Simpson's failure to chart four patients is more egregious on its face than Terrell's alleged failure to chart one patient. "[An] employer's more severe treatment of more egregious circumstances simply cannot give rise to an inference which would support the establishment of a prima facie case of discrimination." *Id.* at 612.

(b) *Simpson has failed to establish pretext*

Even if we were to find that Simpson established a prima facie case of reverse-sex discrimination, his claim would still fail because he cannot establish that the legitimate, nondiscriminatory reason Vanderbilt gave for terminating him—failure to chart his patients—was pretextual. To establish pretext, a plaintiff must show that an employer's stated reason: (1) had no basis in fact; (2) did not actually motivate the challenged conduct; or (3) was insufficient to explain the challenged conduct. *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Regardless of which option is chosen, the plaintiff must produce "'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (alteration in original) (quoting *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001)). If the employer had "an honest belief in its proffered nondiscriminatory reason for discharging an

employee," as evidenced by showing that its decision to discharge the employee was reasonably informed and considered, "the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Sybrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 559 (6th Cir. 2009) (quoting *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001)).

It is undisputed that Araque and Stinson investigated the events that occurred on December 13, 2006, by interviewing Simpson, Houston, and several other employees before concluding that certain required documentation on Simpson's patients was missing. It is also undisputed that the electronic charting on Simpson's four patients was not completed, and that it was at least partially his responsibility to chart those patients. Although Simpson argues that Vanderbilt's "honest belief" in its decision is undercut by the fact that Araque only looked at the electronic records and regarded Simpson with anti-male animus, his own unsupported speculation that Vanderbilt's charges were trumped up is not enough. *See Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 470 (6th Cir. 2002) ("'[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.'" (second alteration in original) (quoting *Carney v. Cleveland Heights-Univ. Heights Sch. Dist.*, 758 N.E.2d 234, 245 (Ohio Ct. App. 2001))). Finally, even if Simpson could show pretext, his claim still fails because he cannot establish that the real reason for his termination was discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993) ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."). Therefore, the district court correctly granted summary judgment on Simpson's reverse-sex discrimination claim.

## 2. Retaliation

In addition to his reverse-sex discrimination claim, Simpson claims that his termination was unlawful retaliation for his complaints about Araque mistreating him because of his gender. "Title VII prohibits retaliation against an employee 'because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' in connection with an allegedly unlawful employment practice." *Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 995 (6th Cir. 2009) (quoting 42 U.S.C. § 2000e-3(a)). To establish a prima facie case of retaliation, Simpson must show that (1) he engaged in protected activity under Title VII; (2) Vanderbilt knew that he had exercised protected rights; (3) Vanderbilt thereafter took adverse employment action against him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.* at 996 (quoting *Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 792 (6th Cir. 2000)). Simpson has not presented a prima facie case for discrimination because he has not established a causal connection between his protected activities and his termination.

(a) *Simpson established that he engaged in protected activity*

Protected activity includes "opposing any practice that the employee reasonably believes to be a violation of Title VII . . . . whether or not the challenged practice ultimately is found to be unlawful." *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579-80 (6th Cir. 2000). We disagree with the district court that Simpson's informal complaints about Araque's behavior do not constitute protected activity under Title VII. This Court has interpreted "protected activity" broadly to include "complain[ts] to anyone (management, unions, other employees, or newspapers) about allegedly unlawful practices." *Id.* at 579. Though it is a close call as to whether his complaints about Araque

were sufficiently related to his claim of reverse-sex discrimination, given this Court's broad interpretation of "protected activity," we find that Simpson met his burden of showing that he engaged in protected activity under Title VII.

(b) *Simpson cannot establish a causal connection between his "protected activity" and his termination*

Although Simpson engaged in protected activity, his retaliation claim fails because he did not establish a causal connection between his protected activity and his termination. To establish causation, Simpson must produce sufficient evidence from which an inference can be drawn that he would not have been fired had he not engaged in the protected activity. *See Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). Causation can be inferred from indirect or circumstantial evidence, including "evidence that [the] defendant treated the plaintiff differently from similarly situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights." *Id.*; *see also Allen v. Mich. Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999). In short, to survive summary judgment, the evidence of causation must be "'sufficient to raise the inference that [the plaintiff's] protected activity was the likely reason for the adverse action.'" *Zanders v. Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (quoting *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982)).

Simpson has failed to establish a causal connection between his informal complaints and his termination. First, Simpson failed to establish that Araque, one of the principals in deciding that Simpson should be terminated, was even aware of his complaints about her behavior. Further, the bulk of his complaints were made during the investigation of the December 13, 2006, incident,

negating any inference that the incident was used as pretext to terminate him for his complaints. The conduct resulting in the termination occurred before the bulk of his complaints, and Vanderbilt was already investigating that conduct. Simpson cannot make out a prima facie case of retaliation because he failed to establish a causal connection.

### 3. Hostile work environment

Finally, Simpson claims that Vanderbilt violated Title VII because it created a hostile or abusive work environment by engaging in reverse-sex discrimination. *See Williams v. Gen. Motors Corp.*, 187 F.3d 553, 560 (6th Cir. 1999) (citing *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 66 (1986)). "Discrimination in this form occurs '[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id*. (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). To establish a prima facie case, Simpson must show that (1) he is a member of a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the harassment was based on his sex; (4) the harassment created a hostile work environment; and (5) the employer is vicariously liable for the hostile work environment. *Clark v. United Parcel Serv., Inc.*, 400 F.3d 341, 347 (6th Cir. 2005) (citing *Williams*, 187 F.3d at 560-61).

With respect to the second and third prongs, this Court has specifically held that the harassment need not be explicitly sexual in nature, but that if the conduct in question is "non-sexual," the plaintiff must show that but for his sex, he would not have been the object of harassment. *Bowman v. Shawnee State Univ*., 220 F.3d 456, 463 (6th Cir. 2000) (citing *Williams*, 187 F.3d at 565); *see also Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 80 (1998) ("The

critical issue . . . is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.") The district court correctly held that despite Simpson's various complaints about Araque, he failed to demonstrate that "any of the actions against him were motivated by sexual bias or animus." As the district court noted, the only incident where Araque even referenced Simpson's gender was when she said that he could be intimidating because of his deep, male voice, and it is questionable whether that comment even constituted harassment. This Court has explained that "it is important to distinguish between harassment and discriminatory harassment in order to 'ensure that Title VII does not become a general civility code.'" *Bowman*, 220 F.3d at 464 (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). Here, aside from his own unsupported allegations, Simpson has made no demonstration that any of Araque's actions were motivated by sexual animus. Therefore, the district court properly rejected his Title VII hostile-work-environment claim.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment.