**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 14a0399n.06

**Case No. 13-3852**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 02, 2014
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| DENNIS WOLFE, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE |
| UNITED STATES STEEL CORPORATION, | ) | NORTHERN DISTRICT OF |
| | ) | OHIO |
| Defendant-Appellee. | ) | |
| | ) | |
| | ) | |

**O P I N I O N**

BEFORE: SUTTON, McKEAGUE, and WHITE.

**McKEAGUE, Circuit Judge.** In this disability discrimination suit, Dennis Wolfe claims that United States Steel Corporation violated the Americans with Disabilities Act or Ohio law when it rescinded his conditional offer of employment after a physical examination revealed that Wolfe had monocular vision. The district court granted summary judgment for U.S. Steel. We **AFFIRM**.

**I.**

Dennis Wolfe ("Wolfe") has 19 years of experience in the steel industry.[1]  In July 2008, Wolfe applied for a Utility Technician Labor Grade 2 position with U.S. Steel at its Lorain Tubular Operations facility and was interviewed for the position in July of 2008.  During the interview, Wolfe was provided with a copy of the job description for the Utility Technician Labor Grade 2 position and asked if he was able to perform all the requirements with or without reasonable accommodation.  Wolfe indicated that he would be able to perform all of the requirements of the job and did not request an accommodation. On July 17, 2008, U.S. Steel made a conditional offer of employment that was expressly contingent on successful completion of a pre-employment medical examination and background check.

Wolfe underwent the required pre-employment medical examination on July 28, 2008, which included a vision test.  The vision test accounted for near, far, peripheral, and color vision, and visual and field defects. Dr. Cheryl Szabo ("Dr. Szabo"), U.S. Steel's Medical Director for the Lorain facility, rated Wolfe's vision against U.S. Steel's standards, which mirror the federal standards for a commercial driver's license under the Federal Motor Carrier Safety Regulations.[2]

---

[1] Wolfe began working in the steel industry in 1989.  His job duties have included programming the line to cut tubes to customer qualifications, inspecting tubes, ensuring there was no burrs or other problems inside or out, grinding defects, changing dies, operating light and heavy duty tow motors, emptying bins, and loading raw materials.  Wolfe has operated an overhead electric crane at one of his previous jobs in the steel industry, though operation of the electric crane was not one of his primary job responsibilities and was completed on an "as-needed" basis.

[2] The Federal Motor Carrier Safety Regulations state that a person is physically qualified to drive a commercial motor vehicle if that person:

> (b) (10) Has distant visual acuity of at least 20/40 (Snellen) in each eye without corrective lenses or visual acuity separately corrected to 20/40 (Snellen) or better with corrective lenses, distant binocular activity of at least 20/40 (Snellen) in both eyes with or without corrective lenses, field of vision of at least 70 degrees in the horizontal Meridian in each eye, and the ability to recognize the colors of traffic signals and devices showing standard red, green, and amber . . . .

49 C.F.R. § 391.41(b).

U.S Steel's policy provides:

> The physical classification of "2" indicates the employee requires consideration for the job assignment because of impairment(s) requiring special attention for appropriate placement. The work stipulation(s) are to be indicated by the addition of one or more of the following letter codes:
>
> . . .
>
> 2EZ    Avoid jobs requiring average or above average visual acuity (even with corrective lenses). May be placed in a job requiring less than average visual acuity. An employee who wears corrective lenses but whose vision cannot be corrected to better than 20/50 in worse eye cannot fill jobs requiring average or above average visual acuity.

R. 21-2, Dr. Szabo Depo. Ex. at 111, PageID # 585.

Dr. Szabo, following her examination of Wolfe determined that his visual acuity fell under U.S. Steel's "2EZ" and "2M" classifications. Because Wolfe has monocular vision, he has no depth perception, no peripheral vision, and no visual acuity in his left eye. Dr. Szabo determined that he failed to meet the minimum threshold for average vision as defined by U.S. Steel's corporate standard. [3]

---

[3] U.S. Steel's policy provided the following standards for visual acuity:

> A Class 2 physical rating indicates that an individual has one or more significant impairments which limit working ability or capacity, constitute a direct threat to safety or health of self or others at work, or may be aggravated by work or the environment; but these impairments are not necessarily causes for employment rejection or removal from the job. A Class 2 physical rating should be looked upon as a classification of the individual's abilities, not disabilities. It should indicate the job placement restrictions, which will best utilize the skills of the impaired individual in the safest and most effective manner, whether such individual be a post-job offer candidate for employment or an employee who has sustained a temporary or permanent impairment.

R. 21-2, Dr. Szabo Depo. Ex. at 110, PageID # 584.

People falling within the "2EZ" classification may also be subject to the "2M" restriction. This restriction prohibits the operation of hazardous machinery including cranes and mobile equipment. Accordingly, under the 2EZ and 2M classification, Wolfe was restricted from mobile equipment operation and other job duties requiring average or above average visual acuity.

When the Department Manager of Personnel and Labor Relations at the Lorain facility, Christiana Johnston, learned about Wolfe's visual impairment or medical classification, she called the medical department for an explanation regarding the restrictions and learned that the 2EZ classification excluded Wolfe from jobs entailing inspection and grinding, and that he was further restricted from performing jobs that included mobile equipment operation.

According to the job description, a Utility Technician Labor Grade 2:

> Operates equipment and performs tasks that support operations of the various producing units and works with materials and equipment to handle, transport and process product and materials. Directs the flow of material to and from producing units and inspects material. Operates equipment associated with producing units and inspects material. Operates equipment associated with producing units such as roll grinders, etc. and operates material handling equipment such as overhead electric cranes, feeders, etc. and mobile equipment such as tractors, trucks, heavy equipment, dozers, loaders, boom trucks, mobile cranes (various sizes and types), etc. Inspects and performs maintenance on all associated equipment.

R. 20-2, Armendariz Depo. at 2, PageID # 324.

Wolfe's restrictions directly conflicted with the job requirements of the Utility Technician Labor Grade 2 position. Under the terms and conditions of the Basic Labor Agreement between U.S. Steel and the United Steel workers, employees are required to perform

*all* functions of the job. The Plant Manager,[4] John Wilkinson ("Wilkinson") testified that the seamless mills and shipping yard where Utility Technician Labor Grade 2 employees were assigned include the movement of heavy metal loads by motorized power equipment and large overhead cranes.

An important consideration in hiring decisions at U.S. Steel is the safety of the employee and co-workers. When asked by human resources as to whether Wolfe could perform the Utility Technician Labor Grade 2 position, Wilkinson concluded that restricted vision would inhibit a person's ability to see movement of machinery or heavy metal loads or the location of other employees and thereby endanger other employees. Wilkinson, therefore, stated that there could be no accommodation that would permit an individual with monocular vision to safely perform the essential functions of the Utility Technician Labor Grade 2 position.

Following Dr. Szabo and Wilkinson's recommendations, U.S. Steel determined that Wolfe could not safely perform the essential functions of the Utility Technician Labor Grade 2 position, and that no accommodation would allow Wolfe to safely perform the essential functions of the job. After an evaluation of Wolfe's actual physical rating classification against the essential functions of the Utility Technician Labor Grade 2 requirements, U.S. Steel withdrew its conditional offer of employment to Wolfe on August 13, 2008.

Wolfe filed a complaint on April 27, 2012, alleging that U.S. Steel violated the Americans with Disabilities Act ("ADA") and Ohio laws by withdrawing a conditional offer of employment after U.S. Steel determined that Wolfe could not work in positions which required "average or above average visual acuity." Wolfe claimed that U.S. Steel, despite awareness of

---

[4] When Wolfe was conditionally hired by U.S. Steel, Wilkinson was not the Plant Manager. Instead, he was a frontline manager, who supervised crews of Utility Technicians, including those in Utility Technician Labor Grade 2.

Wolfe's prior work history, acted upon the information of its onsite medical provider without making any effort to determine whether Wolfe was qualified for the position.

On April 15, 2013, U.S. Steel filed a motion for summary judgment. Following briefing by the parties, on July 12, 2013, the district court granted summary judgment in favor of U.S. Steel on all of Wolfe's claims. The district court found that there were no genuine issues of material fact that U.S. Steel "regarded" him as disabled under the ADA and that U.S. Steel conducted an individualized inquiry to determine that Wolfe was "otherwise qualified" for the position save for the vision requirement. The district court then concluded that there was no genuine issue of material fact that U.S. Steel's vision requirement was a "business necessity." Because Wolfe was unable to point to any evidence to the contrary, the district court granted summary judgment in favor of U.S. Steel. On July 12, 2013, Wolfe timely filed a notice to appeal the final judgment.

## II.

This court reviews a district court's grant of summary judgment *de novo*. *Gecewicz v. Henry Ford Macomb Hosp. Corp.*, 683 F.3d 316, 321 (6th Cir. 2012). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a grant of summary judgment, we must view the evidence and draw all reasonable inferences in favor of the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question, but does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 250—51.

The parties do not dispute that this case is governed by the pre-amended version of the ADA. *Milholland v. Sumner Cnty Bd. of Educ.*, 569 F.3d 562, 567 (6th Cir. 2007). Where a plaintiff presents direct evidence of discriminatory treatment under the ADA, the following elements must be established:

> (1) The plaintiff bears the burden of establishing that he or she is disabled.
> (2) The plaintiff bears the burden of establishing that he or she is "otherwise qualified" for the position despite his or her disability:
> > (a) without accommodation from the employer;
> > (b) with an alleged "essential" job requirement eliminated; or
> > (c) with a proposed reasonable accommodation.
> After a prima facie case is made, the burden shifts to the employer to prove that
> (3) a challenged job criterion is essential, and therefore a business necessity, or that a proposed accommodation will impose an undue hardship upon the employer.

*Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir. 1996) (abrogated on other grounds by *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312 (6th Cir. 2012) (en banc). Ohio's disability-discrimination statute and the ADA employ the same analysis. *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 872 (6th Cir. 2007) (citation omitted).

The parties have extensively briefed whether U.S. Steel conducted an "individualized inquiry" in determining whether Wolfe was qualified for the position. Wolfe, however, glosses over the one issue which this Court finds dispositive: Does Wolfe have a "disability" as defined by the ADA? We think not and uphold the district court's grant of summary judgment in favor of U.S. Steel.

The first step in evaluating an ADA claim is determining whether the person has a "disability." The pre-amended ADA defined "disability" as:

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
(B) a record of such impairment; or
(C) *being regarded as* having such an impairment.

*See* 42 U.S.C. § 12102(2) (2006) (emphasis added).

A person may be considered to have a "disability" under the ADA if he is "regarded as disabled." The "regarded as disabled" prong of the ADA "protects employees who are perfectly able to perform a job, but are rejected . . . because of the myths, fears and stereotypes associated with disabilities." *Greuner v. Ohio Cas. Ins. Co.*, 510 F.3d 661, 664 (6th Cir. 2008) (internal citations and quotation marks omitted). An employee may be regarded as disabled within the meaning of the ADA, when: "'(1) [an employer] mistakenly believes that [an employee] has a physical impairment that substantially limits one or more major life activities; or (2) [an employer] mistakenly believes that an actual, nonlimiting impairment substantially limits one or more [of an employee's] major life activities.'" *Id.* (quoting *Sutton v. United Air Lines*, 527 U.S. 471, 489 (1999)).

Wolfe claims that U.S. Steel regarded him as disabled with respect to his ability to work. When working is the affected major life activity, the statutory phrase "substantially limits" requires, at a minimum, that plaintiff allege that he is unable to work a broad class of jobs. *Sutton*, 527 U.S. at 491. The EEOC uses a specialized definition of the term "substantially limits" which it defines as:

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).

Accordingly, there are several factors that courts should consider when determining whether an individual is substantially limited in the major life activity of working, "including the geographical area to which the individual has reasonable access, and 'the number and types of jobs utilizing similar training, knowledge, skills or abilities, within the geographical area, from which the individual is also disqualified.'" *Sutton*, 527 U.S. at 492 (quoting 29 C.F.R. §§ 1630.2(j)(3)(ii) (B) (1991)). The Supreme Court has stated that to be substantially limited in the major life activity of working "one must be precluded from more than one type of job, a specialized job, or a particular job of choice." *Id.* The inability to perform a single, particular job does not constitute a "substantial limitation." *Mahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002); *see also EEOC v. J.B. Hunt Transp., Inc.*, 321 F.3d 69, 77 (2d Cir. 2003) ("[A] finding of perceived disability may not rest merely on a single employer's failure to hire a candidate."); *Baulos v. Roadway Express Inc.*, 139 F.3d 1147, 1154 (2d Cir. 1998) ("Courts have uniformly held that an employer does not necessarily regard an employee as handicapped simply by finding the employee to be incapable of satisfying the singular demands of a particular job." (internal citation omitted)). The employee carries the burden of showing that the employer's perception of his disability led to excluding him not just from one job, but from "either a class of jobs or a broad range of jobs in various classes . . . ." 29 C.F.R. § 1630.2(j) (2006); *Daughtery v. Sajar Plastics, Inc.*, 544 F.3d 696, 704 (6th Cir. 2010).

Wolfe has not carried his burden that U.S. Steel regarded him as disabled. To begin, Wolfe has not provided any evidence that he was excluded from a "broad range of jobs in various classes . . . ." 29 C.F.R. § 1630.2(j) (2006). There is no evidence in the record that Wolfe was excluded from a wide variety of jobs. Rather, the evidence in the record is that Wolfe

was excluded from one job: Utility Technician Labor Grade 2. Wolfe has also not put forth any evidence to suggest that U.S. Steel perceived monocular individuals as unable to perform a broad range of jobs. Nor has Wolfe provided any evidence to suggest that U.S. Steel perceived Wolfe as unable to perform a large number of jobs. To the contrary, the evidence suggests that, notwithstanding his monocular vision, Wolfe can perform a broad range of jobs that require a certain level of vision, as evidenced by his previous jobs in the steel industry, including his experience operating an electric crane. Indeed, the key theme of Wolfe's appellate argument is that he *can* handle lots of jobs on a plant floor, and nowhere in the record does U.S. Steel say anything to the contrary or otherwise contradict this ability to handle a wide range of jobs. The company merely says that he cannot safely perform *this* particular job.

In arguing to the contrary, Wolfe relies on a brief exchange in Wilkinson's deposition, claiming that it shows U.S. Steel thought Wolfe could not work a "broad range of jobs." 29 C.F.R. § 1630.2(j) (2006). It does no such thing. Here is his testimony:

> A. They asked me a situation if they had an employee that had this disability, would there be an opportunity for them to work within this facility?
>
> Q. Okay. And what did you tell them?
>
> A. Obviously, I thought about it for a while. Looking at *our jobs from the point of view that I have*, I told them no.

R. 23-1, Wilkinson Depo. at 32, PageID # 801 (emphasis added).

This testimony cannot bear the weight that Wolfe places on it. While Wilkinson was asked a broad question—whether Wolfe could work "within this facility"—he had no authority to offer an opinion on that score. At the time, he was a "frontline manager" overseeing Utility Technicians and thus was in no position to consider whether the plant had other jobs Wolfe could perform. R. 23-1 at 10–12. Consistent with his position, Wilkinson did not answer the broad

question but instead answered a more limited one: Could Wolfe perform a job "from the point of view that [Wilkinson] ha[d]" as a frontline manager? Everything that follows comes from that point of view. "[N]o," he thought, Wolfe could not safely perform a Utility Technician job. Then, when he speaks about his "safety" concerns, he talks about problems that might be caused by monocular Utility Technicians. And when he talks about his employees' responsibilities for making "quality" products, he is talking about the responsibilities of Utility Technicians. *See id.* at 32–33. The Utility Technician position is just one job, not "a class of jobs or a broad range of jobs in various classes," 29 C.F.R. § 1630.2(j) (2006), meaning Wolfe has not shown that Wilkinson—or U.S. Steel—"regarded" him as disabled. *See Anderson v. Inland Paperboard & Packaging, Inc.*, 11 F. App'x. 432, 436 (6th Cir. 2001).

What is more, Wilkinson and other U.S. Steel employees understood that Wolfe was capable of performing other jobs in an industrial environment. For example, Wilkinson knew that in 2008 all applicants for Utility Technician positions had to pass a preliminary interview process, one part of which required applicants to show that they had "a year of industrial experience." *See* R. 23-1 at 43–44. The human resources representative that interviewed Wolfe (and who made a conditional job offer to Wolfe) remembered that U.S. Steel was looking for applicants with "a year of manufacturing experience." R. 20-1 at 14–15. And the medical professional responsible for conducting Wolfe's pre-employment physical examination noted that monocular vision wouldn't necessarily disqualify applicants from operating hazardous equipment, *see* R. 21-1 at 36, and that U.S. Steel has "other employees . . . [with] monocular vision," *id.* at 42. All of this suggests that everyone at U.S. Steel involved in the hiring process—from the managing steelworker to the human resources representative to the medical examiner—understood that Wolfe could perform other jobs for the company at this location.

They simply determined that, based on their pre-existing job qualifications, Wolfe could not safely perform this one.

Wolfe also claims that there is additional evidence that U.S. Steel regarded him as disabled because U.S. Steel classified him as "2M" and "2EZ." The problem with this argument is that employers are entitled to adopt qualification standards designed to make sure the individual applicant is suited for the job. By its terms, the "ADA allows employers to prefer some physical attributes over others and to establish physical criteria." *Sutton*, 527 U.S. at 490. An employer runs into legal troubles when it makes an employment decision based on a physical or mental impairment that is regarded as substantially limiting a major life activity. *Id.* U.S. Steel did not err when it classified Wolfe under its "2M" and "2EZ" classifications, nor does the fact that Wolfe received these classifications show that U.S. Steel regarded Wolfe as being excluded from a "broad class" of jobs. Rather, the classifications only indicated that Wolfe could not do specific jobs that required a certain level of vision.

Despite viewing the facts in a light most favorable to Wolfe, this Court concludes that U.S. Steel did not regard Wolfe as disabled. *Simpson v. Vanderbilt University*, 359 Fed. Appx. 562, 568 (6th Cir. 2009); *see also Milholland*, 569 F.3d at 568 ("That the defendants were aware of [the plaintiff's] health issues does not support a conclusion that they misperceived [the plaintiff's] physical abilities as impaired and affecting [the plaintiff's] performance."). Wolfe cannot carry his burden because he does not have evidence that U.S. Steel regarded him as having substantial limitations on any major life activities. It is true that U.S. Steel was aware of Wolfe's monocular vision, but awareness of an impairment is not enough to prove that the impairment was regarded as substantially limiting major life activities. *Brady v. Potter*, 273 Fed. Appx. 498, 503 (6th Cir. 2008). As the only evidence Wolfe set forth was the testimony of

Wilkinson, Wolfe has not carried his burden of proof to show that U.S. Steel regarded him as disabled and therefore has not established a prima facie case of disability discrimination.

## III.

For these reasons, we **AFFIRM**.

**HELENE N. WHITE, Circuit Judge** (dissenting). I dissent. Wolfe correctly asserts

that to establish a prima facie case of disparate treatment he must show that 1) he is disabled or

regarded as disabled, 2) he is otherwise qualified to perform the essential functions of the job

with or without reasonable accommodation, 3) he suffered an adverse employment action,

4) U.S. Steel knew or had reason to know of his disability, and 5) the adverse employment action

was taken because of his disability. *See Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 452 (6th

Cir. 2004); *Holiday v. City of Chattanooga*, 206 F.3d 637, 642 (6th Cir. 2000); *Monette v. Elec.

Data Sys. Corp.*, 90 F.3d 1173, 1178 (6th Cir. 1996), abrogated on other grounds by *Lewis v.

Humboldt Acquisition Corp., Inc.*, 681 F.3d 312 (6th Cir. 2012) (en banc). Wolfe also correctly

asserts that the ADA mandates an individualized inquiry in determining whether an employee's

disability disqualifies him from a particular position. To properly evaluate a job applicant, the

employer must conduct an individualized inquiry into the impact, if any, the disability has on

that individual's ability to perform the essential functions of the job. *See, e.g., Holiday*, 206 F.3d

at 642.

I agree with the district court that Wolfe presented sufficient evidence to survive

summary judgment on the issue whether U.S. Steel regarded him as disabled. PID 1695-96.

U.S. Steel rated Wolfe unable to work as a Utility Technician 2, a *generic* position involving

multiple jobs.[1] U.S. Steel rated Wolfe unable to perform *any* position requiring average or above

---

[1] The Utility Technician 2 job description provides:

> Operates equipment and performs tasks that support operations of the various
> producing units and works with materials and equipment to handle, transport and
> process product and materials. Directs the flow of material to and from producing
> units and inspects material. Operates equipment associated with producing units
> such as roll grinders, etc.[,] and operates material handling equipment such as
> overhead electric cranes, feeders, etc.[,] and operates material handling equipment
> such as overhead electric cranes, feeders, etc.[,] and mobile equipment such as

average acuity.  PID 504-05.  And U.S. Steel rated Wolfe unable to operate or work within six

feet of hazardous machinery.  Hazardous machinery, according to U.S. Steel's "Physical Rating

Classification," includes but is not limited to "cranes, mobile equipment, saws, conveyors, punch

presses, rolling mills, remote control equipment and other machinery in mines or in the field."

PID 586.

One of Wolfe's arguments below was that the hazardous-machinery restriction

effectively disqualified him from any position on the plant floor.  The district court properly

concluded that a reasonable jury could infer as much from Wilkinson's testimony.  PID 1696.

Wilkinson testified that during the summer of 2008, he held the position of Shift Manager of 3

Seamless Hot Mill operations at U.S. Steel's Lorain facility, which entailed supervising

approximately thirty Utility Technicians whose labor grades ranged from 1 to 5.  PID 779-81,

798.  Wilkinson testified that U.S. Steel's Labor Relations department sought his input regarding

Wolfe's ability to work at the Lorain facility given Wolfe's monocular vision:

> Q.  Do you ever recall an employee with, I guess, either a false eye or vision in
> only one eye who applied for a position in the summer of 2008?
>
> A.  I remember a conversation that we had with our labor relations department,
> asking us about *the ability of someone to work within our environment*.
>
> Q.  Okay.  Tell me about that conversation.  How did that come about?
>
> A.  You know, the conversation came about – obviously it sounds like they had an
> interview with someone, and this restriction came up, or disability . . . They
> brought it to our attention and said would this be something that would be able *to
> be accommodated within our facility*?
> . . . .

---

tractors, trucks, heavy equipment, dozers, loaders, boom trucks, mobile cranes
(various sizes and types), etc.[,] inspects and performs maintenance on all
associated equipment.

They asked me a situation if they had an employee that had this disability, would there be an opportunity for them to work *within this facility*?

Q.  Okay.  And what did you tell them?

A.  Obviously, I thought about it for a while.  Looking at our jobs from the point of view that I have, I told them no.

Q.  Okay.  And you said looking at our jobs from the point of view that I have; can you elaborate on that a little bit?  I mean, what was your thought process?

A.  Sure . . . .  [S]afety was the first and foremost, you know, opportunity that I looked at to see if that would put that person's safety in jeopardy, or the other people in the area, as an industrial environment is challenging to work in . . . .
From the quality standpoint would be the next one I always looked at, just to make sure that we're putting a product out into the environment that obviously keeps us employed . . . . and then I just look at an overall, you know, look of our operations, and what's the best fit for our business.

Q.  Did you consider how having vision only in one eye would affect safety?

A.  Absolutely.

Q.  And how did you think it might affect safety?

A.  You know, when you take a look *at the jobs that people perform in the environment that we work in*, having vision that would be blocked from one side or another, reaction time, things they would see or not see coming from one direction or another.  You know, the ability to, you know, detect an employee that was in a position or not in a position, you know.  Those are the key things that we take a look at.
. . . .
Q.  [] What made you think that having one eye would limit someone's vision?

A.  I guess, you know, from the standpoint that having the ability to not see from one side or another.  You know . . . when I take an eye test, cover one eye up, and I have a hard time having my peripheral vision on the other side.  So that's kind of one of the things that I use as an example.  So I cover this eye up, I have a hard time with my peripheral over here, because my other eye can only go so far.
. . . .

Q. Was there anything else other than peripheral vision?

A. Just overall awareness . . . I guess my assumption would have to swing their head back and forth to scan the entire area. So that reaction time may have a different effect on how they could react in an environment.

PID 799-80, 801-03, 805-06, 807 (emphasis added).

Wilkinson's testimony, which was *uncontroverted*, says what it says. U.S. Steel could have submitted evidence below that clarified or refuted Wilkinson's testimony but did not. Nonetheless, the majority concludes that Wilkinson's testimony does not support that U.S. Steel excluded Wolfe from a class of jobs or broad range of jobs in various classes, jettisoning our obligation to view the facts and inferences therefrom in Wolfe's favor. Similarly, the majority incorrectly concludes that Wolfe put forth no evidence to suggest that U.S. Steel perceived monocular individuals as unable to perform a broad range of jobs.

**Otherwise Qualified to Perform the Essential Functions of Utility Technician 2 With or Without Reasonable Accommodation**

I also agree with the district court that Wolfe was "otherwise qualified" for the Utility Technician 2 position. The question is not whether Wilkinson's or U.S. Steel's assumptions regarding the effect of monocular vision on Wolfe's capacity to perform are held in good faith; the question is whether Wolfe can do the essential functions of the job notwithstanding his monocular vision. Here, there was evidence that he could. As the district court observed, Wolfe's experience in similar jobs "demonstrated that he would be qualified for the job were it not for U.S. Steel's vision requirement." PID 1697. Assuming that the business necessity

defense is appropriate here[2], U.S. Steel has the burden of showing that its vision requirement is a business necessity. PID 1699.

> It may be a defense to a charge of discrimination . . . that an alleged application of qualification standards, tests, or selection criteria that screen out or tend to screen out . . . an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation.

42 U.S.C. § 12113(a). To show business necessity, a *defendant* must prove by a preponderance of the evidence that its qualifications standards are job-related for the position in question, consistent with business necessity, and cannot be met by a person with plaintiff's disability even with a reasonable accommodation. *Hamlin v. Charter Twp. of Flint*, 165 F.3d 426, 429 (6th Cir. 1999) ("The ADA prohibits an employer from using qualification standards to deny employment 'unless the standard . . . is shown to be job-related for the position in question and is consistent with business necessity.") (quoting 42 U.S.C. § 12112(b)(6)); *see also Atkins v. Salazar*, 677 F.3d 667, 681 (5th Cir. 2011). "To show job-relatedness, an employer must demonstrate that the qualification standard fairly and accurately measures the individual's actual ability to perform the essential functions of the job." *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 997 (9th Cir. 2007) (en banc) (internal quotations omitted); *see also* H.R. Rep. No. 101-485(III), at 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 445, 454-55 ("If a person with a disability applies for a job and meets all selection criteria except one that he . . . cannot meet because of a disability, the criterion must concern an essential, and not marginal, aspect of the job . . . [and] be carefully tailored to measure the actual ability of a person to perform an essential function of the job.").

---

[2] Wolfe asserts that his is a pure disparate treatment claim and that the business necessity defense applies only to disparate impact claims.

U.S. Steel did not satisfy its burden of establishing a business-necessity defense; it made no showing that it applied a job-related qualification standard required by business necessity or that its visual acuity standards accurately measured Wolfe's actual ability to perform the Utility Technician 2 position.

I would reverse the grant of summary judgment and remand for further proceedings.